**In re BBT, a Nevada limited partnership, Debtor.**

**The PROVIDENT BANK, Agent, an Ohio banking corporation, Plaintiff,**

**v.**

**BBT, a Nevada limited partnership, Defendant.**

**Bankruptcy No. 80–00815.**
**Adv. No. 81–0007.**

United States Bankruptcy Court, D. Nevada.

May 8, 1981.

Harvey S. Schochet and Michael J. Lawson, of Steefel, Levitt & Weiss, San Francisco, Cal., Steven T. Walther, of Walther, Key, Maupin, Oats, Cox, Lee & Klaich, Reno, Nev., for plaintiff.

Ronald S. Orr and Brent A. Whittlesey, of Gibson, Dunn & Crutcher, Los Angeles, Cal., William E. Peterson, of Woodburn, Wedge, Blakey & Jeppson, Reno, Nev., for defendant.

## OPINION AND DECISION

BERT M. GOLDWATER, Bankruptcy Judge.

This is an adversary action to lift the automatic stay in a Chapter 11 reorganization and a counterclaim for accounting and turnover of funds. The background of the parties is as follows:

As of December 30, 1978, BBT had executed four agreements by which 200 general purpose 70-ton boxcars were purchased from a Mexican manufacturer and builder pursuant to a purchase agreement with American Financial Corporation under which: [1] (1) The principal agreement takes the form of a Conditional Sales Agreement between The Provident Bank (Provident), an Ohio banking corporation, as vendor or agent [2] and defendant debtor, a limited partnership, as vendee; (2) BBT as owner appointed Railway Freight Car Services, Inc., as its agent to perform all of the duties of the Conditional Sales Agreement; (3) BBT as owner entered into an agreement with Columbus & Greenville Railway Company (C&G), a short-line railroad in Mississippi, as its manager of the boxcars; [3]

---

1. The purchase agreement referred to in the recitals is dated January 4, 1979, and was acquired from the Cantor Fitzgerald Group, Ltd., as assignee subject to a Finance Agreement.

2. Provident is referred to in one document as agent for Great American Insurance Company, an Ohio corporation (Exhibit 4).

3. This agreement places the boxcars with C&G with provision for charges when the boxcars

and (4) BBT assigned its Agency Agreement and Management Agreement to Provident.

The sales price of the boxcars, $7,500,000, was 80/20 financing. BBT paid a $1,500,000 cash down payment leaving a balance of $6,000,000 payable in quarterly installments over a period of 15 years with interest at 12½%, 16½% in the event of default. Debtor paid approximately $1,500,000 in payments on the debt but defaulted on an installment payment of principal and interest on October 30, 1980. The Conditional Sales Agreement also calls for payment to a Maintenance Fund Escrow which payments due quarterly were alleged to be $1,250 short on January 30, 1980, and totally defaulted on October 30, 1980.

Plaintiff's alternate theory of recovery is based upon 11 U.S.C. § 1168 which permits taking possession of rolling stock conditionally sold to a debtor without regard to 11 U.S.C. § 362 or § 363 where the secured party with a purchase-money security interest has not been before 60 days of the commencement of the case assured by the debtor of performance and the default cured. It is conceded here that no assurance of performance nor cure of the default was made within the time provided in Section 1168.[4]

### I.

Provident contends there is cause including a lack of adequate protection [11 U.S.C. § 362(d)(1)], and, further, that the property is not necessary to an effective reorganization [11 U.S.C. § 362(d)(2)].[5]

The acquisition of the boxcars in 1978 was at a time when tax laws encouraged investment in rolling stock. The manufacture and acquisition of rolling stock, particularly boxcars, increased rapidly until there were more than adequate numbers to service the nation's railroad freight demands. When the national economy began slowing in 1979, the utilization of boxcars began to drop until today those boxcars which do not have a priority for utilization have little or no use.[6] BBT not only is not in a priority position with C&G, but general purpose boxcars are the last of railroad stock to be put into use. Special boxcars, gondolas, flatcars, and others are usually called up for use before general purpose cars.

The present flat market for general purpose boxcars began in mid-1980 and is expected to continue for at least one year and,

---

are used "off line" (by other railroads). No charge is made while the boxcars are on the C&G line.

4. Plaintiff's motion for summary judgment under Section 1168 was denied although the Court believed that section applied. The debtor argued that Section 1168 is a part of Subchapter IV relating to railroad reorganization; that 11 U.S.C. § 103(g) provides "Subchapter IV of Chapter 11 of this title applies only in a case under such chapter concerning a railroad" and BBT admittedly is not a railroad. See 11 U.S.C. § 101(33). Further, BBT contended that Section 1168 was derived from Section 77(j) of the former Bankruptcy Act and was intended to apply only to railroads. See H.R.Rep.No.95–595, 95th Cong., 1st Sess. 423 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. While the Court believed Section 1168 applied in this case (Section 1168 is not in its own terms limited to railroads; refers to "the commencement of a case under this chapter"—not subchapter; and is noted in the House Report to be parallel with Section 1110 relating to aircraft and vessels), it held that it would serve one of the principal purposes of the Code (determination of whether there could be an effective reorganization) to

deny the motion and proceed under Section 362. The Court also felt that the overriding philosophy of the Code (to determine if there could be a "fresh start") was far more in the interest of both claimant and debtor than an appeal to test the technical application of Section 1168.

5. It is conceded that BBT has no equity in the rolling stock because the total secured claim exceeds $6,000,000 and the boxcars have a fair market value of substantially less.

6. Utilization of rolling stock by railroads is generally on a priority basis. First, the railroads use their own rolling stock. Subsequent use of boxcars belonging to third persons is according to the date of priority of the management or other agreement. In this case C&G has two agreements for boxcars prior to BBT. Thus it is obligated to give priority to others before resorting to the BBT boxcars. It should be noted, however, that under BBT's agreement it can terminate with C&G at any time without liability and make other agreements which could give it a better utilization priority.

according to some experts, eighteen months to two years. It is expected to definitely improve from its low as the business cycle changes.[7]

There are no manufacturers now adding general purpose boxcars to the supply but some manufacturers are gearing up expecting that after the passage of time demand will justify production. Old boxcars are gradually being retired and experience shows there have been low and high demands with changes in the business cycle over the last 35 years.

The BBT boxcars are worth between $20,000 and $25,000 per car at fair market value.[8] A sale of boxcars requires the seller to deliver the cars (per mile charge per unit to place of delivery), paint new logos for the buyer, and pay a commission for the sale. The useful life of a general purpose boxcar is 20 to 40 years. After 20 years a complete overhaul is necessary.

The 200 BBT all-steel 70-ton general purpose boxcars are located at numerous sidings along the C&G lines in Mississippi. They are in good condition. A few minor, easily repairable damages can be seen on examination. They have not been vandalized or rusted. They are standard in grade, desirable in size for American railroad use, and well constructed.

Witnesses on market use and sale value of boxcars testified that there are move-ments in the market for boxcars from time-to-time but the market for boxcars is a very special area. BBT is engaged in discussions with railroads and others in the market place. Some of these discussions tend to look encouraging but there is nothing definite as to any of the offers or pending negotiations. Various factors affecting market price always must be considered, but, in general, the market price of $20,000 to $25,000 has been a firm plateau since the filing of this case.[9]

■ The sense of adequate protection is that there be protection for the realization of payment of a claim against the property as of the date of filing the case. As a matter of policy and constitutional law, this protection extends only to a creditor's "allowed secured claim" and the unsecured part of a claim will not be entitled to protection. 2 *Collier on Bankruptcy*, 361–5–361–6 (15th ed. 1980).

■ An "allowed secured claim" is a determination generally made under 11 U.S.C. § 506 [10] which provides an allowed claim of a creditor secured by a lien on property has an interest in the estate's interest, and, to the extent that the value is less than the amount of the total allowed claim, the claim is unsecured.

■ For the purpose of this hearing under Section 362, Provident is adequately

---

7. The housing and automobile markets are the principal users of general purpose boxcars. There were also severe changes in the normal market because of the Rock Island Railroad bankruptcy liquidation and Itel Corporation (rolling stock division) economic problems.

8. Plaintiff's witness David Eckles. Defendant did not use any witness as to market value preferring to rely on $20,000 as a present fair market value. Transcript of Proceedings, March 10, 1981, at 23–24. Eckles testified an investor with funds of his own or access to funds at a reasonable rate would be wise at this time to invest his money at $20,000 per boxcar and hold for the future. He further testified that since the middle of 1980 to the present, there has been little fluctuation in the value of railcars.

9. In event of depreciation, a method of adequate protection is suggested by 11 U.S.C. § 361(1) for periodic cash payments to the extent of a decrease in value. *See In re Bermec Corp.*, 445 F.2d 367 (2d Cir. 1971). Collier states: "The most important message of the Code with respect to the treatment of entities with an interest in property of the estate is that their remedies may be suspended even abrogated, their right of recourse to collateral may be terminated as it is consumed in the business, but the *value* of their secured position *as it existed at the commencement of the case* is to be protected throughout the case when adequate protection is required." (Emphasis added.) 2 *Collier on Bankruptcy* 361–6 (15th ed. 1980).

10. Of course, the value determined in the light of the purpose of vacating the automatic stay may not be the same as the value for another purpose such as confirmation of a plan. 11 U.S.C. § 506(a).

secured in that it had, as of the date of filing, a security interest in 200 general purpose boxcars with a market value of $4,000,000 which cars are not depreciating in value and are likely to increase. Provident is not entitled to be secured for its total claim of $6,000,000 unless, when a plan is proposed, it exercises its election under 11 U.S.C. § 1111(b)(2).

During trial BBT produced a letter, backed by reliable bank credit, from Peter S. Bing, its limited partner, which offered Provident $4,150,000 in cash. Provident refused the offer believing it has the right to either (1) vacate the stay or (2) provide its own plan to protect its claim. BBT argues that Provident's success in terminating the stay can only result in Provident's repossession which would require a commercially reasonable U.C.C. sale likely to bring only $4,000,000 or even less after sales costs. However, BBT overlooks Provident's right at such sale to bid its claim, and, if it is the highest bidder, to hold the boxcars until the market justified a sale or other agreement by which it could recoup more than the open court offer. So, too, Provident, as a recourse secured claimant (against the general partners), may bid its claim to the full extent if the property is sold under a plan. 11 U.S.C. § 1111(b)(1)(B)(ii); 11 U.S.C. § 363(k).

■ BBT also contends that Provident will have no more success utilizing the boxcars than BBT and, hence, there is nothing to be gained by vacating the stay at this time. What Provident will do with the property is not a proper issue. BBT cites *In re Castle Village Co.*, 3 BCD 588 (S.D.N.Y. 1977), for the proposition that, inasmuch as Provident, if successful in bidding after lifting the stay, would have to hold and maintain the boxcars and await the improvement of the market utilization the same as BBT, it is not suffering any loss and BBT might as well hold the property as Provident. In *Castle Village*, it was held that the holder of a second deed of trust, after announcing it intended to hold the property after foreclosure bidding, was not entitled to lift a stay in a Chapter XII Act proceeding where its monthly interest was being paid from a net cash flow of $585,000 annually before debt service. The first deed of trust was also being serviced and the holder of the second deed of trust was awarded $300,000 which had accumulated in a surplus fund agreed to be paid to it. BBT also cites *In re Nevada Tower Associates*, 3 BCD 583 (S.D.N.Y.1977), where the stay was continued to allow an apartment building, 90% complete, to be finished and certificates of indebtedness to complete construction were authorized with a priority over the first deed of trust. This was done because the holder of the first deed of trust intended to finish the building if the stay was lifted. As long as completion of the building was a *necessity*, the Court held the debtor should have the first right to finish construction and that the mortgagee could not, in any event, expect a return on its investment until completion and determination of the cash flow.

■ Those cases do not stand for the proposition that if the secured claimant will do nothing more than the debtor with the property the debtor should be allowed to retain the property. The rule of those cases is that the debtor should be given the opportunity to present a plan where *premature* lifting of the stay would cause irreparable damage to the debtor. There is no duty upon the secured claimant to explain what it will do with the property if successful in vacating the stay. The burden is on the debtor to *do* something with the property in a plan and it is not entitled to retain the property indefinitely on the bare statement that it is doing as well with the property as the secured claimant itself could do. If the debtor can do no more with the property than hold it indefinitely with the collateral value firm, then the time for filing a plan has matured because it is then patently clear that the debtor is trying to make the secured claimant its business partner and cannot be reorganized. Of course, the secured claimant, under some circumstances, may want to assume the duty of presenting its own plan. *See* 11 U.S.C. § 1121(c).

Provident is entitled to incidental protection from damages, taxes and parking charges. The C&G is not charging for parking the boxcars (usually $7.00 per day per unit). There is sufficient cash held in accounts created by the agreement of the parties to cover insurance premiums (approximately $17,000 per year), repairs, taxes, and other charges.

**** While BBT has no equity there remains the issue as to whether there may be an effective reorganization. 11 U.S.C. § 362(d)(2) is in the conjunctive. Lack of value equity [plaintiff's only burden of proof 11 U.S.C. § 362(g)(1)] is conceded here, but that does not alone suffice for lifting the stay. There must also be a failure by defendant to show that the property is necessary to an effective reorganization. 11 U.S.C. § 362(d)(2)(B). One of the elements to be considered is earning capacity which has an "equity" for the purpose of determining if there can be an effective reorganization.[11]

The showing here is that these boxcars produced in excess of $1,500,000 between May of 1979 and the end of 1980—a period of 16 months, but the utilization fell from 92% in August of 1979 to 15% in August 1980 (Exhibit 5). Thus there is a record of production when business conditions bring about utilization. An effective plan is a plan which is feasible and must be received and weighed in the light of the condition of the economy, the quality of management, the sources of capital necessary to the production of income, and the resiliency of the business to weather the cycles of change.

It is clear that an effective reorganization is a possibility. Every indication is that the future utilization of the boxcars will improve albeit over an extended time. BBT uses professional management and agency teams well known in the railroad area and sophisticated in dealing with general use boxcars, and BBT has shown it has access to a large amount of cash from an outside source.

**** There can be a "secured claim" in excess of collateral (11 U.S.C. § 1111) in a plan, but there cannot be an "allowed secured claim" in excess of the value of the collateral. 11 U.S.C. § 506 defines the method of determination of the secured status. It would be anomalous to say that the formula of Section 506 should not be used to determine adequate protection. Naturally, where the property is shrinking in value the secured claimant is not protected without payment or additional security, but, where the value of the collateral is firm, the secured creditor is adequately protected in the sense of the Bankruptcy Code if the collateral is otherwise properly insured, relieved of taxes and properly maintained.[12]

11. *In re Pembroke Manor Apartments*, 547 F.2d 805 (4th Cir. 1977), the Court cited with approval the United States Supreme Court case of *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941) to the effect that earning capacity is the criterion for determining whether a plan is for the best interests of the creditors and feasible. The Circuit Court in *Pembroke* held erroneous a conclusion there was no equity based only upon liquidation value which does "not necessarily reflect the earning power of the property as a *going concern*." (Court's emphasis.) In *Pembroke*, occupancy in apartments once at 100% was reduced to 55% occupancy because of a 1974 business recession. There was also actual income records to be considered in *In re Pickett, Gardner, Landers & Associates*, 14 CBC 370 (N.D.Ga.1977) where over $1,000,000 in rents had been collected during a twelve-month period. And in *In re Creed Brothers, Inc.*, 14 CBC 426 (S.D.N.Y.1977), the Court considered accounts receivable in a going lumber business to arrive at the "equity" of the inventory and property.

12. Generally there is no post-petition interest in an undersecured claim [11 U.S.C. § 502(b)(2)]. The additional interest *is* of consequence when the debtor wishes to treat the claim as unimpaired [11 U.S.C. § 1124(1)] in a plan. Otherwise, the terms in a plan, *if* confirmed, are substituted for the impaired items. If the estate's interest is less than the amount of the secured claim then the allowed secured claim under Section 506 would leave the balance including unpaid interest to the date of filing unsecured in a Chapter 11 case. The secured claimant may choose not to vote with the unsecured creditors for that part of the claim and ignore Section 506 by making the collateral security for the entire amount of the claim. 11 U.S.C. § 1111(b)(2). If the undersecured secured claimant exercises its election to be treated as secured then its claim is the

■ Here the Court finds there is no undue risk of material harm to Provident and there is a possibility of reorganization. In the gap of time between filing and confirmation, plaintiff is entitled only to demand the value continue to be in that amount which was the value of the collateral at the commencement of the case.[13]

■ It must be remembered that Section 362 is designed as a holding pattern for secured claims under the Code providing there is adequate protection until a plan takes hold. Should the case be dismissed, or confirmation denied, the secured claimant is entitled to the interim adequate protection.[14] If a plan is confirmed the secured claimant is entitled to the rights provided in 11 U.S.C. § 1129 and to the election under 11 U.S.C. § 1111(b)(2).

■ To the extent the protection found here proves to be inadequate after the fact, i. e., the value of the collateral falls below the $4,000,000 stipulated to be its fair market value at the time of filing, Provident would be entitled to request a priority even

over administrative expenses. The Court is given power in 11 U.S.C. § 361(3) to grant such compensation ahead of priority administrative expense. 11 U.S.C. § 503(b)(1). H.R.Rep.No.95–595, 95th Cong., 1st Sess. 340 (1978). But, when, as here, the secured claimant refused what appears to be the indubitable equivalent ($4,150,000 in cash which was stipulated at the time to be the fair market value) there is a serious question whether the Court should give further protection under Section 361(3), even if the collateral depreciates although a secured claimant has a right to refuse cash out at the time a plan is proposed by the election in Section 1111(b)(2). A secured claimant who wishes time-value for its allowed secured claim has the hard decision whether to take the cash offered which it may put to earning a new investment use or pursue its Bankruptcy Code rights under Section 1111(b)(2). For certain, the gap period compensation, where a cash offer equal to fair market value is made during trial, presents a dilemma to the secured claimant.[15]

amount of the claim at commencement of the case. An interest factor on the allowed amount of the secured claim then must be paid. This option modifies the concept of cram down and the secured creditor may want to prevent cash out in exchange for other terms. *See* Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 *Bankr.L.J.* 133 (1979). A sale under the plan also gives the undersecured secured claimant the right to bid the full amount of the secured claim which would include accrued interest to the date of filing. 11 U.S.C. § 363(k).

**13.** Some courts refer to the "cushion" which may be defined as an excess of value over debt. This is a concept to relieve the necessity of providing further security or payment because there is an area of value which may shrink but yet not fall below the secured claim. In such case where value exceeds debt the interest on the security is also protected. 11 U.S.C. § 506(d). In the event the allowed secured claim, at the time of filing is less than the secured claim, interest stops post-petition because there is no collateral security for additional debt. 11 U.S.C. § 502(b)(2).

**14.** In the event a Chapter 11 debtor exercises its absolute right to convert the case to Chapter 7 [11 U.S.C. § 1112(a)], the secured claimant does not have the right to elect under 11 U.S.C. § 1111(b)(2), is relegated to the value of its

security under 11 U.S.C. § 506, and is, if there is recourse, simply an unsecured creditor as to the deficiency. The right of the secured claimant as to the unpaid balance depends upon the existence of a right of recourse. 11 U.S.C. § 502(b)(1). Right to recourse is immaterial in the election under 11 U.S.C. § 1111(b)(2). A Chapter 11 case converted to Chapter 7 pretty well frees the collateral in most undersecured claims. The trustee may only sell if there is a fair possibility of realizing something for general creditors. *In re Raymond Service, Inc.*, 184 F.Supp. 200 (E.D.N.Y.1960). *Goggin v. Division of Labor Law Enforcement*, 336 U.S. 118, 69 S.Ct. 469, 93 L.Ed. 543 (1949).

**15.** While the collateral value remains firm from commencement of the case to confirmation, the philosophy of the Code is that the secured creditor is protected. Query: What about use-value (interest or rent) for the collateral during the gap between filing and confirmation? No court has said more than preservation and payment against *decrease* is required. For some discussion of this problem, *see In re Anchorage Boat Sales*, 4 B.R. 635, 2 C.B.C.2d 348 (E.D.N.Y.1980) commenting on *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935).

There are many facets to the connotation of indubitable equivalent of Sections 361 and 1129. It cannot be denied that one should

However, as will appear in Part III of this decision, there must be a *reasonable* time for filing a plan. A plan, when filed, must meet the requirement of good faith. 11 U.S.C. § 1129(a)(3).

## II.

 Defendant moved that Provident be declared an unsecured creditor for failure to perfect its security agreement as required by Federal law.

The motion was denied.

Security interests covering railroad rolling stock to be notice and enforceable against all persons may be filed with the Interstate Commerce Commission. The instrument must be acknowledged under commission regulations. 49 U.S.C. § 11303. The form of acknowledgment is required to be (1) in a form authorized by the law of the *state where executed* for the acknowledgment of deeds of land *or* (2) *substantially* in the following form (C.F.R. 1116.3):

Individual Form of Acknowledgment:

State of _____

County of _____, ss:

On this ____ day of _____, 19__, before me personally appeared (name of signer), to me known to be the person described in and who executed the foregoing instrument and he acknowledged that he executed the same as his free act and deed.

Corporate Form of Acknowledgment:

State of _____

County of _____, ss:

On this ____ day of _____, 19__, before me personally appeared (name of signer), to me personally known, who being by me duly sworn, says that he is the (title to office) of (name of corporation), that the seal affixed to the foregoing instrument is the corporate seal of said corporation, that said instrument was signed and sealed on

receive a return for use of collateral to the extent of its value during the gap period after filing. A bankruptcy court probably should provide for adequate protection during the gap period but the dilemma is when. Further protection could come when a plan is confirmed so as to adjust the stream of payments from the date of filing. This has the effect of compensation for the use of collateral during the gap period and through the date of confirmation. Of course, if the secured claimant is unimpaired, interest continues to be a "use charge"

behalf of said corporation by authority of its Board of Directors, and he acknowledged that the execution of the foregoing instrument was the free act and deed of said corporation.

The California law requires an acknowledgment for a partnership by *substantially* in the following form (Calif.C.C. 1190a):

State of _____

County of _____, ss:

On this ____ day of _____, in the year ____, before me (here insert the name and quality of the officer), personally appeared _____, known to me (or proven to me on oath of _____) to be one of the partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

There were two acknowledgments on the Conditional Sales Agreement filed with the Interstate Commerce Commission. The one for the Provident Bank reads as follows:

STATE OF OHIO )
 : SS:
COUNTY OF HAMILTON )

BE IT REMEMBERED, That on the 18th day of January, 1979, before me, the subscriber, a Notary Public in and for said County and State, personally appeared J. Lynn Brewbaker of THE PROVIDENT BANK, the banking corporation whose name is subscribed to and which executed the foregoing instrument, and for himself and as such officer, and for and on behalf of said corporation, acknowledged that he did execute said instrument on behalf of said corporation, and that the signing and execution of said instrument is his free and voluntary act and deed, his free act and deed as such officer, and the free and voluntary act and deed of said corporation for the uses and purposes mentioned in said instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal on the day and year aforesaid.

The acknowledgment for BBT, a limited partnership, reads as follows:

STATE OF CALIFORNIA )
 : SS:
COUNTY OF LOS ANGELES )

BEFORE ME, this 16th day of January, 1979, the Subscriber, a Notary Public in and for

with the stream of payments covering the entire gap period. If the secured claimant elects Section 1111(b)(2), then that claimant is entitled to the allowed secured claim including the unsecured amount to the date of filing discounted to the value of the allowed secured claim from the date of confirmation. What consideration may be given to a "use charge" for the gap period or when the secured claimant is "cashed out" for the value of the collateral will have to be faced by courts on a case-by-case basis.

said County and State, personally appeared Kristina Haiker Pres. & Georgia Hollison, Sec. of BIJUR TRANSPORT, INC. and Kristina Haiker Pres. & Georgia Hollison, Sec. of APARTMENT HOUSE DECORATIVE CO., INC., the General Partners of BBT, a Nevada Limited Partnership, and for themselves and as such Partners and for and on behalf of said Partnership, acknowledged that the signing and execution of the foregoing instrument is their free and voluntary act and deed, their free act and deed, as such Partners, and the free and voluntary act and deed of said Partnership.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal on the day and year aforesaid.

The acknowledgment of the Provident Bank conforms to Ohio law. *See* Ohio Rev. Code Ann. §§ 147.53, 147.54, 147.54.1, and 147.55 (Page).

It is contended that the acknowledgment of BBT does not conform to either the requirements of Federal or California law.

The defect alleged is that the acknowledgment does not state that the persons signing are known to be the persons described in the instrument, or proved on the oath of another or on oath sworn to be such persons.

Primarily, BBT is not a corporation [16] and it is not an individual. It is a limited partnership composed of two corporate general partners and one individual limited partner. There is no Federal form of acknowledgment for partnerships.

The presidents of BBT's corporate general partners signed the agreement, which signatures were attested by their secretaries and seals.

Secondly, it ill becomes BBT to make the technical objection that "Provident Bank

did not comply with Federal law" when BBT itself agreed to take the responsibility for *properly* filing, registering, and recording the document.[17] The signatures of BBT's general partners at Los Angeles, California, were made on behalf of and executed by BBT. BBT was responsible for proper acknowledgments and BBT was duty bound to see that the acknowledgment complied with Federal or California law.

BBT is now a debtor in possession and seeks to arm itself with all the rights of a trustee in bankruptcy to protect the unsecured creditors. 11 U.S.C. § 544. *In re Levine*, 6 UCC Rep.Serv. 238 (D.Conn.1969); *Gardner-Denver Co. v. C. J. Haslam, Inc.*, 325 F.2d 208 (2d Cir. 1963); *In re Copeland*, 16 UCC Rep.Serv. 273 (D.Del.1975).

BBT's scheduled unsecured creditors with a total amount of approximately $100,000 in claims are as follows: [18]

1. Apartment House Decorative Co., Inc., a New York corporation and *general partner of BBT*.

2. BT Transport, Inc., a Nevada corporation.

3. Bijur Lubricating Corporation of Oakland, New Jersey.

4. Columbus & Greenville Railway of Columbus, Mississippi.

Certainly, BBT is not serious about most of these creditors.

Apartment House Decorative Co., Inc., is a general partner.

BT Transport, Inc., sounds very close to BBT and Bijur Transport, Inc., one of the

---

16. BBT's brief argues that the acknowledgment does not conform to the California *corporate* form.

17. Article 19 on page 29 of the Conditional Sales Agreement provides in part:
 *Recording.* Prior to the delivery and acceptance of any Unit of the Equipment and prior to the settlement for such Unit, the Vendee will cause this Agreement, any assignments hereof by the Vendee and any amendments or supplements hereto and thereto, in each case to be filed, registered, recorded, or deposited and refiled, reregistered, rerecorded, or redeposited, with the ICC in accordance with 49 U.S.C. 11303.
 \* \* \* \* \* \*

The Vendee will promptly furnish to the Vendor evidences of such filing, registering, depositing or recording and of such publication of notice of such deposit and an opinion or opinions of counsel with respect thereto, each satisfactory to the Vendor and its counsel.

18. At the hearing to lift the stay there was testimony that approximately $50,000 is due Railway Freight Car Services, Inc., for unpaid commissions. Notice of the time limit for filing claims is limited to disputed, unliquidated or contingent claims. Bankruptcy Interim Rule 3001(b)(2). The notice erroneously included "unlisted claims".

general partners of BBT. *In addition, "BT Transport, Inc." is listed in Debtor's Statement of Affairs as a partner.*

Bijur Lubricating Corporation sounds close to Bijur Transport, Inc., also a general partner.

Columbus & Greenville's status as a creditor is doubtful. The testimony is that BBT is responsible for repairs and maintenance and there is a fund in existence earmarked for that purpose. In fact, C&G holds approximately $16,000 which it wishes to turn over to BBT or Provident.

BBT's motion is extremely technical, if not a complete sham. In addition, by Article 10, on page 16 of the agreement, BBT is required to protect Provident from any application of law which may adversely affect the property rights of the vendor.

A literal compliance is not required where the statute calls for a substantial compliance. *See* 25 A.L.R.2d 1133 (1952) and cases cited therein. The law has been reasonably and fairly complied with. *McQuatt v. McQuatt*, 320 Mass. 410, 69 N.E.2d 806 (1946); *In re Abrams*, 172 Misc. 579, 15 N.Y.S.2d 903 (1939).

The requirements of both Federal law and California law are met by substantial compliance. In *In re Hurt*, 129 F.Supp. 94, 101 (S.D.Cal.1955), a California bankruptcy case, Judge Yankwich held that "statutory provisions relating to acknowledgments are construed liberally." Further, the Court held that a chattel mortgage given to a bank by a *partnership* in which the acknowledgment stated "George E. Hurt and John H. Hurt, his son" substantially complied with California Civil Code 1190a, which requires that a partnership acknowledgment recite that the person or persons signed were proved to be partners of the partnership. And in *Clements v. Snider*, 409 F.2d 549 (9th Cir. 1969), another California bankruptcy case, in holding that substantial compliance is all that is required, the Court stated:

> Rigid construction is a pointless exercise in literalism if it defeats the obvious intentions of the parties without promoting the function of the statute involved.

Provident is a secured claimant.

### III.

A debtor cannot arbitrarily and unreasonably stay a secured claimant. The purpose of Chapter 11, as in the entire history of reorganization in bankruptcy, is to relieve the distressed debtor where there is reasonable expectation of continued useful existence of the business. Early cases are still the law. Honesty and good intentions are not sufficient. *In re Augustyn*, 87 F.2d 577 (7th Cir. 1937); *Manati Sugar Co. v. Mock*, 75 F.2d 284 (2d Cir. 1935). There must be some prospect that the affairs can be reorganized. *In re 2747 Milwaukee Ave. Bldg. Corp.*, 12 F.Supp. 557 (N.D.Ill.1935). The petition must not be filed *solely* for delay. *Lemm v. Northern California National Bank*, 93 F.2d 709 (9th Cir. 1937).

A case must be filed in good faith, else there is cause, independent of lack of adequate protection, to vacate the automatic stay. *In re Victory Construction Co., Inc.*, 4 B.R. 549, 7 BCD 257 (C.D.Cal.1981).

The petition in this case was filed because of a drastic downturn in the market for utilization of boxcars and it is predicated on the potential that there is an expected upturn in the market. If it is pure speculation, it is not enough. *In re Liberty Mortgage Corp.*, 245 F.Supp. 858 (N.D.Ohio 1965). Nor can it be based upon an abiding faith in miracles. *In re Southwest Enterprises, Inc.*, 261 F.Supp. 721 (W.D.Ark. 1966); *Provident Mutual Life Insurance Co. v. University Evangelical Lutheran Church*, 90 F.2d 992 (9th Cir. 1937).

The testimony in this case from both sides is that it will be one to two years for the business cycle to bring about general boxcar utilization.

The issue is now good faith in the light and purpose of the Code that "secured creditors shall not be deprived of the benefit of their bargain." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News 1978, p. 6295 provides "that

the secured creditor receives in value essentially what he bargained for", and that the secured creditors are protected in the "realization of the value" of their interests in the property and assets.

Provident financed BBT with two general partners having assets of approximately $10,000 and with no "on line" lease or use payments to back up the conditional sale payment schedule. Thus, Provident knew or should have known that BBT was dependent upon the market utilization for general purpose boxcars and would have no recourse to any sources with which to make payments in the event of a slump in utilization. Testimony was that generally lenders require borrowers to show ready source of income by lease or other agreement to amortize a loan.

Provident's bargain is that it is entitled to payment subject to the provisions of the Bankruptcy Code and adequate protection for the collateral until payment.

Essentially Provident's allegations of cause for lifting the stay is that this case was not filed in good faith because there is no likelihood of an improvement in the market for boxcars within a reasonably foreseeable future and Provident is suffering during the pendency of the stay.

It is true that BBT was able to show only two possibilities in the near future for utilization. In both cases BBT was frank to admit that the opportunities were uncertain and indefinite, and, in one case, dependent upon ICC approval as a condition of its contractual opportunities with one rail line. Provident thus concludes that BBT has no meaningful proposal and only "high hopes".

Provident's cases in support of cause are distinguishable.

*In re Anchorage Boat Sales, Inc., supra* note 15, the Court lifted the automatic stay holding there was no reasonable possibility of reorganization. In so holding the Court said: "Nothing in the record would indicate that the debtor has an outside source of funds which would enable the debtor to finance a plan of arrangement." In the case at bar the debtor has met the burden of proof that it has the ability to pay the fair market value of the boxcars in cash.

*In the Matter of Terra Mar Associates,* 3 B.R. 462 (D.Conn.1980) the stay was lifted after the debtors had an extended time to seek someone to refinance their operation. "The debtors have not made any meaningful proposals to safeguard the plaintiff or offer it adequate protection in the event the estate foreclosure is further stayed and the benefit of the bid of $640,000.00 plus assumption of taxes is lost. The plaintiff requires the cash from the foreclosure sale to pay off pressing debts of its own." There was only hope on the part of the debtors in *Terra Mar,* but here there has been a meaningful proposal made. Perhaps Provident does not want to take the cash now but the size and character of the offer is meaningful.

*In re Castle Ranch of Ramona, Inc.,* 3 B.R. 45 (S.D.Cal.1980) a debtor acquired a 338 acre ranch from one who had gambled on the hopes that he would be able to sell the property for a quick profit. In fact, the ranch was advertised for sale before it was acquired by close of escrow. The hopes did not come to fruition. Compare that to a legitimate operation of boxcars on which the debtor paid $1,500,000 down and over one and one-half million dollars in payments and is willing to meet the fair market value of over four million dollars in cash.

*In Jacobsen J-J Ranch, Inc.,* 4 BCD 245 (M.D.Fla.1978) the stay was lifted in a Chapter XI Act case where the Court found "it is evident that the debtor has no sincere desire to make peace with a secured creditor; when the delays are inordinate and unreasonable; when the delays are sought solely for the admitted purpose, to stall and to frustrate secured creditors in their attempt to enforce their lien rights until the debtor may, by some magic, find the funds necessary to escape from its predicament." Nothing in the record in this case is an attempt to stall nor does the debtor expect magic. It is entitled to reasonable time for an opportunity to see if it can develop a plan.

■ Both sides have moved to modify the date for filing a plan. BBT moved for an extension of the exclusive right of a debtor to file a plan. Provident moved for orders shortening the exclusive time to file a plan. That motion has become moot.[19] Provident has also moved to dispense with the disclosure statement. 11 U.S.C. § 1125(b). This cannot be done. The notice of hearing has been held to be mandatory and jurisdictional. *Northwest Recreational Activities, Inc.,* 8 B.R. 10, 2 C.B.C.2d 41 (N.D.Ga.1980).

■ The Court has been shown during the trial of this case that BBT has access to funds outside the limited partnership when BBT's limited partner made a cash offer of $4,150,000. It is as clear as the day follows night that BBT has no present income and has only some cash deposit with Provident and very limited assets of its general partners' corporations. It is eminently clear that BBT cannot be reorganized unless it can provide a plan which will meet its obligation to Provident. It is also patently clear that Provident, at least during the trial, will not accept a cash out. Under the circumstances where it appears a debtor has shown a bona fide access to substantial sums of cash that debtor should be given an opportunity to file a plan if during an interim period there is no decrease in the value of the collateral. However, it is equally plain that it is unreasonable to allow an extension of time to present a plan for eighteen months to two years. BBT's showing at the hearing to vacate the stay was that it had recourse to substantial private capital and potential future agreements, although uncertain, to utilize the boxcars. These discussions, although indefinite, need six months. Boxcar deals take time. Hence, BBT should be given an opportunity to present a plan because BBT has shown that it is not totally and wholly without possibility of reorganization and may be able to carry its burden of payments and protection until there is a change in the business cycle which brings about utilization of its property so as to be self-supporting.

This case was filed November 10, 1980. The plan[20] should be filed on or, preferably, before, November 9, 1981, together with a disclosure statement. This is reasonable.

The hearing on the disclosure statement *and* for confirmation of the plan should be consolidated and set for 30 days after filing the plan and statement.

The plaintiff's complaint to vacate the stay should be dismissed.

### IV.

Prior to the time of the order for relief on November 10, 1980, two checking accounts had been created at Provident Bank in Ohio as bank accounts required by the terms of the agreements between the parties. One account was a maintenance account to which payments were to be regularly made for the future care and preservation of the boxcars. The other account was for receipts from income charges for the utilization of the boxcars.

Provident, as agent for itself and Great American Insurance Company, maintained these accounts as "zero accounts". That is,

---

**19.** It was stipulated that the time limit of debtor to file a plan under 11 U.S.C. § 1121(c)(2) (120 days after the date of the order for relief) would be considered extended to the date of this decision. It was also stipulated that the 30-day rule limits of 11 U.S.C. § 362(d) be extended until date of this decision.

**20.** The plan in this case should be filed in the alternative of "cash out" or the option of Section 1111(b)(2). If Provident elects § 1111(b)(2) then it will not vote as an unsecured creditor and it is assumed the unsecured class will vote for the plan thus having one class accept. 11 U.S.C. § 1129(a)(10). If it elects to cash out then the Court must find the fair cash value as of the date of the plan [11 U.S.C. § 1129(b)(2)(A)] as the indubitable equivalent of the value of its collateral. There will remain the question of the classes and votes of creditors including Provident's unsecured claim. The election provided in § 1111(b)(2) for an undersecured secured claimant should be made in advance. But how? One cannot elect until one sees the proponent's plan. Yet one cannot propose a plan until it is known what the election may be. To save time and make sense, alternative plans should be filed if possible.

as each deposit was made the money was promptly transferred to a money market interest paying company called Midwest Income Investment Company (Midwest). When checks were written on the accounts, Provident honored the checks promptly and later the money equal to the check was transferred from Midwest into the checking account to equal the withdrawal. Midwest had corresponding accounts known as Midwest No. 5958 Income Account and the other Midwest No. 3529 Maintenance Account.

On November 7, 1980, Provident drew a check to itself against an account in the bank for $14,125.75 and on November 10, 1980, a check to Great American for $8,122.29. Both checks were credited and posted on the bank's statement of deposits and withdrawals on the date of the checks prior to the filing of this case. The funds were not transferred into the bank's checking account from Midwest until after this case had been filed.

BBT contends it is entitled to the funds as a post-petition transfer under 11 U.S.C. § 549(a) and that Provident was on notice of the filing of this case at the time the funds were transferred from Midwest. Hence, BBT reasons that Provident is not excused from turnover as a transferee without knowledge of the commencement of the case under 11 U.S.C. § 542(c). *See Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966).

Provident posted the checks as paid before the filing of this case although the funds belonging to the account were not actually in the account until later. Posting the checks before the filing of this case, although the funds were not in the account, completed payment. U.C.C. § 4–303. *Gibbs v. Gerberich*, 1 Ohio App.2d 93, 203 N.E.2d 851 (1964) holds that checks are deemed paid prior to notice of stop order when the "process of posting" is complete. That process in Ohio is (1) the decision to pay and (2) recording the payment regardless of any amount in the account.

Other moneys consisting of $15,512.55 deposited January 21, 1981, in a savings account at Provident No. 030–5008017 and

$145,239.38 drawn by Provident after filing should be turned over to BBT subject to further order of the Court. These are from deposit accounts consisting of cash collateral. 11 U.S.C. § 363(a). Provident's lien extends to these funds except to the extent that the Court, after notice and a hearing and based upon the equities of this case, orders otherwise. 11 U.S.C. § 552. BBT is also entitled to any money held by C&G subject to the Court's order in the same manner.

Let Judgment be entered accordingly.