**In re SIRIUS SYSTEMS, INC., Debtor.**

**Bankruptcy No. 89–11127.**

United States Bankruptcy Court,
D. New Hampshire.

March 8, 1990.

M. Elaine Beauchesne, Sanders and McDermott, John V. Daly, Hampton, N.H., for debtor.

Peter A. Fine, Choate, Hall & Stewart, Boston, Mass., for Ronald Mahon.

Robert M. Koch, Concord, N.H., for Allied Cable Co.

Bruce A. Harwood, Sheehan, Phinney, Bass & Green, Manchester, N.H., for Erica and Noah Mandell.

Edwin Paul Gale, Wiggin & Nourie, Manchester, N.H., for Phillips Credit Corp.

Whitton E. Norris III, Boston, Mass., for Community TV Corp.

Virginia Greiman, Boston, Mass., U.S.T.

AMENDED MEMORANDUM OPINION AND ORDER ON OSC CONCERNING DISMISSAL FOR CAUSE PURSUANT TO § 1112 OF BANKRUPTCY CODE

JAMES E. YACOS, Bankruptcy Judge.

This voluntary chapter 11 reorganization proceeding commenced by Sirius Systems, Inc. on November 14, 1989 was the subject of an Order to Show Cause entered *sua*

*sponte* by this Court on the same date, based on the pleadings filed with regard to commencement of this case, and upon the record of a prior involuntary case against this debtor in this Court. See *In re Sirius Systems* Case No. 88–751. The Order to Show Cause required the debtor to answer a question as summarized in the Order as follows:

.... as to whether the filing of this case may be an abuse of bankruptcy process, or may justify a dismissal for cause pursuant to § 1112 of the Bankruptcy Code for lack of good faith in the statutory sense relating to chapter 11 of the Bankruptcy Code, in that the case may be determined to be basically a two-party dispute involving nonbankruptcy law not within the intended scope and purpose of a chapter 11 litigation but is simply the continuation of litigation between the shareholders of the corporate enterprise. See *In re HBA East, Inc.*, 87 B.R. 248 (Bankr. E.D.N.Y.1988); *In re Van Owen Car Wash, Inc.*, 82 B.R. 671 (Bankr.C.D. Cal.1988).

The present case also deserves particular scrutiny in view of the pronouncements by the Court of Appeals for the First Circuit in *In re Coastal Cable T.V., Inc.*, 709 F.2d 762 (1st Cir.1983) to the effect that there may be an abuse of the intended scope of relief under chapter 11 of the Bankruptcy Code by a bankruptcy court handling the disposition of assets in a situation in which there is nothing more involved than a dispute between shareholders of a corporate entity as to ownership and appropriate disposition of the assets.

■ There is a well-developed body of case law that holds that chapter 11 petitions can be dismissed for a lack of good faith. See, e.g. *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989); *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986); *In re Madison Hotel*, 749 F.2d 410 (7th Cir.1984); *In re Coastal Cable T.V. Inc., supra.* The statutory basis for such a dismissal is § 1112(b), which says a case may be dismissed "for cause." In reality, however, the good faith requirement has been written into the Code by judicial deci-

sions. A bankruptcy court has "broad discretion to ... dismiss the case", *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 985 (Bankr.N.D.N.Y.1988), which determination is only reversible if "clearly erroneous." *Carolin Corp., supra,* at 702.

There are many reasons why courts dismiss a case for bad faith. The specific issue raised here is that this case arguably is just a two-party stockholder dispute that has little to do with the scope and purpose of a chapter 11 case. There is considerable precedent for this type of bad faith ruling. For example, in *Coastal Cable T.V., supra,* the First Circuit sent the case back to the District Court to consider the good faith issue in part because the state law stock ownership question was the focus of the bankruptcy. The Court stated:

... a chapter 11 reorganization plan must be submitted in good faith. 11 U.S.C. § 1129(a)(3); see 5 Collier on Bankruptcy paragraph 1129.02[3][a] (15th ed.1981). That is to say, there must be some relation—at least an arguable relation—between the chapter 11 plan and the reorganization-related purposes that the chapter was designed to serve—See *In re Nikron, Inc.*, 27 B.R. 773, 778 (Bankr.E.D.Mich.1983); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D.Cal.1982); *In re BBT,* 11 B.R. 224, 235 (Bankr.D.Nev.1981).

\* \* \* \* \* \*

... the need for a bankruptcy proceeding once the state-law ownership in question is resolved seems doubtful ... To meet the "good faith" requirement of § 1129(a)(3), many courts have held that a reorganization plan must bear some relation to the statutory objective of resuscitating a financially troubled corporation. See, e.g. *In re Nikron, Inc., supra; In re Nite Lite Inns, supra; In re BBT, supra.* See generally *Fidelity Assurance Association v. Sims,* 318 U.S. 608, 616–18, 63 S.Ct. 807, 811–12, 87 L.Ed. 1032 (1943); *Tennessee Publishing Co. v. American National Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936); *Lemm v. Northern California National Bank,* 93 F.2d 709, 711 (9th

Cir.1937). We do not understand the relation between this reorganization plan with its proposed sale and any of the purposes of chapter 11.

*Id.* at 764, 765.

Other courts have articulated to a greater extent the "reorganization-related purposes" of chapter 11 that must be implicated in a filing. In *In re Schlangen,* 91 B.R. 834, 837 (Bankr.N.D.Ill.1988), for example, the Court, in finding a two-party requirement dispute brought into bankruptcy court transgressed the good faith requirement, stated:

Chapter 11 was designed to prevent the waste and reduction in asset values that result from unnecessary liquidation. Congress meant to encourage financial restructuring and to reestablish efficient business operations with the goals of permitting greater payments to creditors then could otherwise be made, while also preserving jobs and shareholders' interest. *See e.g., In re Victory Construction Co.,* 9 B.R. [549] at 551–65 [ (Bkrtcy.C.D.Cal.1981) ]; H.R.Rep. No. 595, 95th Cong., 1st Sess. 220–21 (1977), U.S.Code & Admin.News 1978, pp. 5787, 5963, 6179; *In re HBA East, Inc.,* 87 B.R. [248] at 259 [ (Bkrtcy.E.D.N.Y.1988) ]. The good faith standard is the bankruptcy court's equitable mechanism for assuring that a chapter 11 case at least has the potential to serve those purposes.

Similar issues were raised by Judge Lavien of Massachusetts in *In re Harvey Probber, Inc.,* 44 B.R. 647, 650 (Bankr.D. Mass.1984) where he stated:

While individuals as well as corporations may file a Chapter 11, the essence of the chapter is business reorganization of some sort. Its justification is the public interest in preserving jobs, and something roughly described as business activity which will, hopefully, be taxable while promoting to the extent possible an equitable distribution for creditors and investors. However, loose this description, it clearly was not intended as an alternative forum for private disputes that only involved the disputants for

which there was a well established albeit less expeditious forum.

Given these concerns, a two-party dispute involving state law is usually not kept in the bankruptcy court when the question is squarely raised. See, e.g., *In re Ravick Corp.,* 106 B.R. 834 (Bankr.D.N.J.1989); *In re Stulley,* 108 B.R. 174 (Bankr.S.D.Ohio 1989); *In re Walter,* 108 B.R. 244 (Bankr. C.D.Cal.1989); *In re Colonial Manor Assoc., Ltd.,* 103 B.R. 315 (Bankr.M.D.Fla. 1989); *In re Schlangen, supra; In re HBA East, Inc.,* 87 B.R. 248 (Bankr.E.D.N.Y. 1988); *In re Van Owen Car Wash, Inc.,* 82 B.R. 671 (Bankr.C.D.Cal.1988) (Yacos, J., sitting by designation). *In re Anderson Oaks (Phase I) Ltd. Partnership,* 77 B.R. 108 (Bankr.W.D.Tex.1987); *In re Landmark Capital Co.,* 27 B.R. 273 (Bankr.D. Ariz.1983). (There is also useful discussion of something like the good faith standard in involuntary cases. See e.g., *In re Colonial Ford,* 24 B.R. 1014 (Bankr.D.Utah 1982); *Matter of Win–Sum Sports, Inc.,* 14 B.R. 389 (Bankr.D.Conn.1981)).

There are, of course, factual differences between these cases and the case before me. In *In re Ravick,* the debtor brought the petition to avoid a contract. In *In re Stulley, In re Walter, In re Colonial Manor Assoc., Ltd.,* and *In re Schlangen,* the bankruptcy petition was also filed to postpone foreclosure. In *In re HBA East, Inc.,* the debtors had no assets and all the debt was subject to the two-party dispute. In *In re Van Owen Car Wash, Inc.,* the debtor had ceased business, and had no assets except for the lawsuit. In *In re Anderson Oaks (Phase I) Ltd. Partnership,* the debtor had no other debts except the party with whom it had a dispute. And, in *In re Landmark Capital Co.,* the petition was filed on the eve of the foreclosure, and there was a lack of debt except with the party in dispute.

On a more precise basis it can be said from the case law that bankruptcy courts generally do not entertain simple two-party disputes brought to the bankruptcy court under the guise of a chapter 11 "reorganization" when the chapter 11 filing can be properly characterized instead as simply

another "litigation tactic" between the contending parties. In this regard, some background facts stemming from both this and the prior case in this Court need to be understood with regard to the present question before the Court.

Sirius is a closely-held New Hampshire corporation in the business of operating cable television franchises in central New Hampshire. Noah and Erica Mandell started the corporation in 1980, and originally owned all of the 100 shares of stock. On November 14, 1983, the Mandells signed a Stock Purchase and Option Agreement with Ronald Mahon. Under the agreement, the Mandells sold 99 percent of the stock to Mahon in exchange for a promise to obtain a $600,000 construction loan for the benefit of the corporation, and certain repurchase options to the Mandells. (Mahon became the President and sole director of the corporation).

The first repurchase option allowed the Mandells to buy 24 percent of the stock from Mahon at the price of $40 per share. This option was only exercisable after November 14, 1988. The second repurchase option allowed the Mandells to purchase the remaining 75 percent of the stock at any time after exercising the first option for a price according to a formula set forth in the agreement.

On January 12, 1985, the Stock Purchase and Option Agreement was amended to give stock option rights to a key employee. Thus, under the first option the Mandells could purchase up to 22.5 shares, and under the second option they could purchase 72.5 shares. In 1985, a $600,000.00 loan was obtained for the business for which Sirius and Mahon signed. Mahon has also loaned considerable sums of money to the corporation. The precise amount is disputed, but Mandell estimates it to be about $600,000.

On November 3, 1988, Mahon signed an asset sale agreement for Sirius with a third party. The sale price was $2.4 million. The agreement was subject to stockholder approval. On November 14, 1988, the Mandells attempted to exercise their first repurchase option by tendering a check to Mahon who refused to negotiate the check. Also on that date the minority shareholders asserted their rights under the New Hampshire appraisal statute. See N.H. RSA 293–A:82 (1987) (dissenting minority shareholders can receive fair value of stock). On November 20, 1988, Mahon voted to approve the asset sale as the purported holder of 98 percent of Sirius stock.

On December 1, 1988, the three minority stockholders filed the involuntary chapter 11 petition in bankruptcy referred to above against Sirius before the asset sale was consummated. (The stockholders were later deemed creditors by the Court by virtue of their statutory right to appraisal under New Hampshire law.)

The Court in the prior involuntary case never reached a determination on the merits as to whether an order for relief would be entered on the involuntary petition. The trial set for that purpose on March 13, 1989 was cancelled when the parties stipulated and agreed to a sales procedure and mechanism for disposing of the company. The pending $2.4 million sale was dropped, and ultimately the parties negotiated a sale of the same assets for a sum in excess of $3.2 million. The Court approved the settlement which provided for the agreed-upon sale and also provided for the dismissal of the involuntary chapter 11 case. A subsequent dispute arose in which Mahon refused to go forward with the sale, for personal reasons, but the Court ultimately entered an order on June 28, 1989 providing for enforcement of the settlement agreement and dismissing the case without an order for relief.

The record of the prior case, and the record of the parties' constant changing of positions regarding an appropriate sale and disposition of the corporate assets, is absolutely dripping with irony on the facts involved. It is unnecessary to go into great detail for present purposes. However, briefly, the original $2.4 million sale engineered by Mahon at the end of 1988 was at a low price but would have benefited Mahon because it would have blocked the Mandells from recapturing an interest in the company. The sale negotiated in the

spring of 1989 was subject to the discretion of Mahon and he in fact did agree to the sale, in the amount of $3,260,250.00, as a way of resolving the involuntary bankruptcy filing and achieving a fair realization on the corporate assets. However, for personal reasons having nothing to do with the merits of the sale, Mahon subsequently refused to go forward with the sale, resulting in a need for this Court to enter the enforcement order mentioned above under the strong policy of encouraging settlements in the courts. Mahon's appeal from that order in the involuntary case remains pending before the District Court.

Thereafter, the sale authorized under the parties' settlement agreement never was actually consummated, following the June 28, 1989 order, for various reasons which are in dispute. The Mandells contend that Mahon did everything possible to block consummation of the sale because of personal concerns relating to independent litigation he was having with his ex-wife in a divorce proceeding relating to his assets. Mahon contends that the Mandells realized that the asset values were increasing constantly due to the buildup of the cable television market in the Plymouth, New Hampshire area and therefore did not want to consummate the sale themselves.

After the prospective purchaser indicated on September 1, 1990 that no further action to consummate the sale was justified the Mandells, who now apparently had obtained necessary financing to exercise their second repurchase option, started actions to recover control and ownership of the corporate entity. At this point Mahon, who had originally opposed the entry of orders enforcing the settlement agreement and sale, came to this Court in the involuntary proceeding and requested an entry of an order *enforcing consummation of that same sale*. The Court refused such action in that it had already dismissed the prior case, on a settlement basis, and considering that the parties could litigate in an appropriate state forum their respective contentions as to who was at fault as to failure to consummate the sale.

When the Mandells attempted to exercise their second option to repurchase, Mahon did not comply. Noah Mandell, under a contention relating to equitable rights allegedly stemming from this refusal, asserted he could act as president and director of Sirius. Thus, in November, 1989, he requested the bank holding the checking account of Sirius to close its current account and open a new one with his sole check-signing authority. The bank apparently froze the funds instead, until the shareholder dispute was resolved, and checks have not been honored.

The foregoing recitation of the convoluted history of this corporate entity's appearances in this Court is necessarily abbreviated and can not do full justice to the myriad of conflicting contentions and confusion engendered. However, one thing that *is* abundantly clear in both records is that Sirius Systems Inc. was a solvent corporation in December 1988, when the prior bankruptcy case was filed, and likewise was clearly a solvent corporation in November 1989 when the present chapter 11 filing was made.

Sirius and Mahon note correctly that under the 1978 Bankruptcy Code there is no requirement of insolvency to qualify for filing a voluntary or involuntary chapter 11. They also note that unlike some of the "two-party dispute" dismissal cases the present case involves an on-going business; involves substantial assets in the enterprise aside from a lawsuit that was the subject of prior state court litigation; and, also involves a substantial body of non-insider trade creditors to be covered in a plan of reorganization.

With regard to the "body of outside creditors" allegedly involved in this chapter 11 proceeding, the record establishes that essentially all of those creditors were created by the freeze on the corporate bank accounts caused by the Mandell–Mahon rancorous dispute summarized above. It is crystal clear that if the rancor between these parties can be laid aside there is no reason whatsoever that such trade debt cannot be paid from the operations and assets of the debtor. Likewise, it is clear

that the ongoing operations of the debtor should be adequate to keep current trade debt paid as due.

It continues to be true, as it was shown in the prior case, that non-insider creditors can be covered by a sale of the debtor's assets and/or a resolution of the dispute between the shareholders resulting in a more harmonious future operation of the debtor's business. If a sale of $2.4 million was adequate for that purpose, it follows without question that a sale at $3.2 million or more will be equally adequate, since the record does not show any substantial increase in trade payables other than due to the "freeze" referred to above.[1]

Given the foregoing discussion, it could be stated that the present case still is nothing more than a dispute between Mahon and the Mandells with no true need for bankruptcy court reorganization relief to benefit any outside parties or true creditor body. However, it has been held that a two-party dispute does not *per se* constitute a bad-faith filing by a chapter 11 debtor. *In re Stolrow's, Inc.*, 84 B.R. 167, 171 (9th Cir. BAP 1988). In the present case, Sirius and Mahon argue that bankruptcy court relief is necessary to avoid the stalemate stemming from the continuing disputes between the shareholders, so that a sale of the assets at maximum value may be effectively consummated *or* more capital can be injected into the business to expand its operation and realize more out of future operations. No case cited to date has held that a two-party dispute between shareholders can stay in the bankruptcy courts on that ground alone but of course there are no cases to the contrary either.

▮ This brings the Court to the basic question as to whether it can find the present chapter 11 petition was filed by Sirius and Mahon in bad faith within the § 1112(b) ground of "for cause" dismissal of the proceeding. In the present case this question essentially boils down to the further question as to whether this chapter 11 filing is just another litigation tactic between the shareholders. Cf *Furness v. Lilienfield*, 35 B.R. 1006 (D.Md.1983).

Here there is no question in my mind that *both* Mahon and the Mandells have caused bankruptcy filings in this court as part of their overall litigation tactics against each other. Moreover, their constant shifts in position (each adopting later the position on the sale of assets and chapter 11 filings that they vigorously denounced on the part of their opponent earlier) again demonstrate that a lot of litigation tactics are behind the various positions taken by the shareholders in these cases.

However, there is one unique facet of *this* chapter 11 filing that is material and decisive on the question presented to the Court. Sirius and Mahon at the time of filing their voluntary chapter 11 petition also filed a joint motion consenting and requesting appointment of a Chapter 11 Trustee to supervise and control the chapter 11 proceedings. That motion when granted will eliminate the exclusive control by Mahon over the formulation of a plan of reorganization in this case. It will also put into control of the debtor's operations, as well as in the key role in formulating a plan of reorganization, a disinterested party not beholding to either Mahon or the Mandells.

1. In a preliminary ruling in the prior case the Court refused to dismiss the involuntary chapter 11 filing as a "two-party dispute" because arguably there was a need for the preference and fraudulent transfer avoidance powers under §§ 547 and 548 of the Bankruptcy Code in the circumstances then presented. [See transcript, January 20, 1989, Case No. 88–751, pp. 66–68]. That matter related to a security interest that Mahon caused Sirius to grant to him on October 18, 1988, covering some $600,000 in unsecured prior cash advances that he had made to the corporation, which would be reachable under the one-year statute of limitations applicable to

such avoidance actions. That reason no longer would apply to the present chapter 11 filing since this case was filed more than one year prior to the arguably avoidable transfer to Mahon. [The Court at this time expresses no opinion as to whether the equitable subordination power under § 510(c) of the Bankruptcy Code might be applicable in the present case.] Ironically, the §§ 547–548 attacks might become a live issue again if Mahon is successful in his pending appeal from the dismissal of the prior involuntary case—resulting in a consolidation with the present case.

**56**

If multiple alternative plans of reorganization are filed in this case, due to the lack of exclusivity on the part of the debtor, the court will be in a position to choose between the competing plans if the shareholder dispute cannot be resolved in a timely fashion by the shareholders themselves. Moreover, the chapter 11 Trustee could also seek sale of the assets outside of a plan if interminable litigation between the shareholders threatens this estate and the other outside interests involved in the same. Accordingly, this chapter 11 proceeding with a chapter 11 trustee appointed can put this Court and the chapter 11 trustee in a position, if the record so warrants, to realize the maximum enterprise value of the debtor corporation for the benefit of creditors *and* the stockholders, and leave for subsequent determination in this or another court the ultimate resolution of the stockholders' conflicting rights to any sale proceeds after payment of creditors. Accordingly, it is hereby

ORDERED that the Order to Show Cause entered *sua sponte* by this Court on the question of "for cause" dismissal under § 1112(b) of the Bankruptcy Code is answered in the negative and the Court will not sua sponte dismiss this chapter 11 case as a bad faith case as a bad faith filing because Mahon and the debtor have exhibited good faith in taking action to place the assets and reorganization plan beyond their own direct and exclusive control; and because there is an arguable need to stabilize the situation between these rancorous and stalemated stockholders to permit an effective realization of maximum enterprise value through either a sale of the assets or the injection of additional capital into the enterprise in a more stable and predictable situation.

DONE and ORDERED.

**1.** In this case, the debtor's wife, who is a co-owner of the property held as tenants by the