In re I–95
TECHNOLOGY–INDUSTRIAL
PARK, L.P., Debtor.

Bankruptcy No. 90–11813.

United States Bankruptcy Court,
D. Rhode Island.

April 1, 1991.

John Boyajian, Boyajian, Harrington & Richardson, Providence, R.I., for debtor.

Richard M. Peirce, Roberts, Carroll, Feldstein & Peirce, Inc., Providence, R.I., for Bank of New England–Old Colony, N.A.

### DECISION AND ORDER DENYING MOTION TO DISMISS

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on December 18 and 19, 1990, and January 9, 1991 on the motion of Bank of New England/Old Colony (BNE) to dismiss the Debtor's Chapter 11 case, and on the Debtor's objection.[1]

The Debtor filed its Chapter 11 petition on October 24, 1990, listing secured debt of $2,394,000; taxes of $77,872.14; unsecured debt of $86,568; and assets of $4,700,876.54, $4,050,000 of which is the Debtor's valuation of its real estate, and $650,760 which represents an unliquidated claim against Universal Truck & Equipment Leasing, Inc. (Universal).

1. The U.S. Trustee filed a Statement of Position indicating that she does not support the motion to dismiss, on the basis that as of December 18, 1991, the Debtor had provided the required proof of insurance, had filed a request for and received a waiver of the monthly reporting requirements, and was within the exclusivity period for filing a plan of reorganization.

## FACTS

On July 9, 1987, Joshua Teverow borrowed $1,825,000 from BNE to purchase 135 acres of undeveloped land, adjacent to Interstate 95, in both the towns of Coventry and West Greenwich, Rhode Island. This loan was evidenced by a 60 day note and was secured by a mortgage on the referenced real estate. Teverow contributed $250,000 of his own funds as the balance of the $2,075,000 purchase price.

In 1987 Teverow intended to develop the property into an industrial park and has, during the course of the following chronology, been personally and continuously involved in the planning, engineering, and approval process. He testified that the short term of the initial note was the result of an aborted joint venture with the United Auto Worker's union, whose treasurer died before an agreement was formalized, and whose successor was unwilling to pursue the project.

By letter of August 28, 1987, Teverow requested a 60 day extension on the note "to enable me to conclude negotiations concerning a joint venture partner for this development." Petitioner's Exhibit 2.

On October 22, 1987, Teverow outlined the status of the project and of various joint venture proposals, and requested additional time to secure an acceptable arrangement. BNE assented to this latest request, extending the maturity date of the note to January 15, 1988, conditioned upon receipt of a $100,000 principal payment.

On January 15, 1988, Teverow and BNE entered into a "Note Modification Agreement" by which the term was changed to a demand note, thereby extending the due date again.

On March 23, 1988, Teverow entered into a partnership agreement with three limited partners, and himself as the sole general partner, forming I–95 Technology–Industrial Park, L.P. (I–95).[2] Teverow then conveyed the subject property to the new entity.

Fifteen months later, on June 30, 1989, BNE rewrote the loan in the amount of $2,330,000, this time with I–95 as the Borrower. The maturity date was December 30, 1989, with interest payable monthly. The proceeds of that loan: 1) paid BNE a fee of $7,000; 2) paid an outstanding note in the amount of $125,000; 3) funded an escrow account in the amount of $125,000, for future debt service; and, 4) disbursed $400,454[3] to I–95.

On February 27, 1990, BNE notified I–95 that it was in default of the June 30 note, but nevertheless agreed to extend the maturity date of the note to June 30, 1990 with several conditions.[4]

On July 3, 1990, after I–95 again failed to meet its note obligations, BNE made demand for payment of the outstanding balance, and announced it would continue with foreclosure proceedings scheduled for August 15, 1990, unless full payment was received within seven days. One week la-

**2.** Teverow provided his interest in the property as his initial capital contribution. Donald Dwares contributed $190,000 for a 40% limited partnership interest; Frederick Weingeroff and Gregg Weingeroff each contributed $142,500 for respective 30% limited partnership interests.

**3.** Of the $400,454 paid to I–95: $183,000 went to Teverow; $122,000 went to the limited partners; and, $95,454 was allocated for partnership expenses.

**4.** The conditions included an immediate payment of $135,500 ($23,076 to be applied to unpaid interest, and $112,426 held in escrow). BNE concluded the extension agreement by indicating its apparent disinclination to extend the due date any further:

> The Borrower understands, agrees and confirms that Bank was extremely reluctant to

> extend the maturity date of the Note on account of the Borrower's failure to pay, at maturity, the Note and loans preceding the Note which the Note refinanced. IT IS FURTHER ACKNOWLEDGED AND AGREED THAT THE BANK *WILL NOT ENTERTAIN* ANY FURTHER REQUEST FOR AN EXTENSION OF THE MATURITY DATE BEYOND JUNE 29, 1990. THE NOTE SHALL BE DUE AND PAYABLE IN ACCORDANCE WITH ITS TERMS, AS AMENDED HEREBY, ON JUNE 29, 1990. FAILURE TO PAY THE UNPAID PRINCIPAL AND INTEREST OF THE NOTE ON THAT DATE SHALL RESULT IN THE IMMEDIATE EXERCISE BY THE BANK OF ALL OF ITS RIGHTS AND REMEDIES UNDER THE DOCUMENTS EVIDENCING THE LOAN.

Petitioner's Exhibit No. 10 at 3 (emphasis in original).

ter, after numerous discussions with Teverow, BNE proposed that it would agree to a further 60 day extension, to allow I–95 to consummate a sale of 21 acres of the property to one Nicholas Cambio/Universal (an abutter), for $630,000, and to obtain an access easement. This extension was conditioned on, inter alia, payment to BNE of 100% of the proceeds from the intended sale, expeditious action on the easement problem, the right to immediate demand on a $450,000 note secured by a first mortgage on Teverow's home, and a release of any lender liability claims against BNE. The Debtor agreed to this latest proposal.

In accordance with the July 12 proposal, BNE withdrew its foreclosure notice and extended the due date of the note to September 11, 1990.

On July 19, I–95 and the Town of Coventry entered into an agreement whereby Coventry would postpone its scheduled tax sale of the Coventry portion of the property, in consideration of I–95 making scheduled payments on its 1989 tax debt.

On September 11, I–95 had not made the required payment to BNE, and also failed to consummate the Cambio transaction.[5] As a result, BNE rescheduled the foreclosure to October 11, 1990. This latest default notice notwithstanding, Teverow requested still more time to obtain the easement—and why not, based on the history of this loan?

Again, BNE extended the foreclosure sale date to October 25, 1990. On October 22, Coventry removed the property from the tax sale list for November, to allow more time for the Cambio sale. On October 23, I–95 obtained the easement. The following day, on the eve of BNE's scheduled foreclosure sale, I–95 filed its Chapter 11 petition. On October 25, the easement was recorded.

*"CAUSE" UNDER 11 U.S.C. § 1112(b)*

BNE's motion is based on 11 U.S.C. § 1112(b) which provides, in part, that:

on request of a party in interest or the United States trustee, and after notice

and a hearing, the court may ... dismiss a case under this chapter ... in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any fixed time by the court; ....

We are asked by BNE to find that the Debtor's pre-petition conduct and filing of the instant Chapter 11 petition constitute sufficient cause under § 1112(b) to warrant dismissal of the case. The term "cause" under § 1112(b) has received extensive treatment, and it is clear, both in the language of the subsection and by case law, that the enumerated grounds for dismissal are not exhaustive. *See, e.g., American Surety Co. v. Marotta,* 287 U.S. 513, 53 S.Ct. 260, 77 L.Ed. 466 (1933) (the terms "shall include" and "including" are not exclusive); *In re Gonic Realty Trust,* 909 F.2d 624, 626 (1st Cir.1990) (§ 1112(b) list of grounds not exclusive); *In re Wentworth,* 83 B.R. 705, 707 (Bankr.D.N.D.1988) (same).

■ It is equally clear that bad faith may constitute "cause" under § 1112(b). *See Gonic,* 909 F.2d at 626; *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988); *In re Del Rio Dev., Inc.,* 35 B.R. 127, 128 (Bankr. 9th Cir.1983); *Matter of Little Creek Dev. Co.,* 779 F.2d 1068, 1071 (5th Cir.1986); *In re Assembled Interests Corp.,* 117 B.R. 31, 34 (Bankr.D.N.H.1990); *In re Sirius Systems, Inc.,* 112 B.R. 50, 51 (Bankr.D.N.H.1990); *In re Bryan,* 104 B.R. 554, 557 (Bankr.D.Mass.1989). As we have recently held, "good faith is an operative, if not an express condition to the filing of a Chapter 11 petition." *In re Donuts of Seekonk, Inc.,* 122 B.R. 172, 174 (Bankr.D.R.I.1990).

■ Although "good faith" or its antonym, "bad faith" are not defined in the

5. *See infra* note 7.

Code, the court in *Little Creek* noted certain recurring patterns of lack of good faith. *Little Creek*, 779 F.2d at 1072–73. *Wentworth* classified those patterns into an oft-cited list of 14 factors:

1. The debtor has few or no unsecured creditors;
2. There has been a previous bankruptcy petition by the debtor or a related entity;
3. The pre-petition conduct of the debtor has been improper;
4. The petition effectively allows the debtor to evade court orders;
5. There are few debts to non-moving creditors;
6. The petition was filed on the eve of foreclosure;
7. The foreclosed property is the sole or major asset of the debtor;
8. The debtor has no ongoing business or employees;
9. There is no possibility of reorganization;
10. The debtor's income is not sufficient to operate;
11. There was no pressure from outside creditors;
12. Reorganization essentially involves the resolution of a two-party dispute;
13. A corporate debtor was formed and received title to its major assets immediately before the petition;
14. The debtor filed solely to create the automatic stay.

*Wentworth*, 83 B.R. at 707. We view these factors as guideposts only, and understand that they are not listed conjunctively. The absence of one or more factors in a particular case does not negate bad faith, any more than the existence of all or most of the factors would inevitably lead to a finding of bad faith. Courts are required to exercise their sound judgment in ruling on a motion to dismiss, and cannot be constrained by any particular test or pronouncement of factors which would limit their ability to determine what is in the best interest of creditors and the estate. *See Gonic Realty Trust*, 909 F.2d at 626–27; *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989) (the danger of "indicia-counting" must be guarded against; totality of circumstances inquiry adopted). Nonetheless, these factors are illustrative, and we are mindful of them, on a case by case basis.

## BAD FAITH

■ In this single asset case we are called upon to determine whether the Debtor's eleventh hour filing, after chronic failure to comply with the terms of its various financing commitments, constitutes bad faith.

It is beyond dispute that Teverow and I–95 missed every self-imposed or bank-mandated deadline with BNE. We offer no opinion as to whether I–95 was simply unrealistic and/or naive in its economic assumptions and business judgments, nor whether the bank may have been guilty of even more serious miscalculations. Likewise, we draw no inferences (at this juncture) from the bank's demand for, and I–95's granting of a release to the bank of any lender liability claims.

Plainly, I–95's efforts and activities had the effect of delaying BNE's foreclosure. But it is also true that BNE agreed to each and every extension or forbearance, in each instance exacting what it thought was a bit more security. However unsatisfactory I–95's (and its predecessor, Mr. Teverow's) conduct may have been, we must focus on the Debtor's intent on or about the date the petition was filed. Not surprisingly, the petition was filed on the eve of foreclosure, apparently on the assumption that the Debtor had finally exhausted the bank's patience, and that there was no recourse other than to invoke the protection of the automatic stay. However, merely seeking that protection is insufficient to justify dismissal. *See Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584, 586 (3d Cir.1985). *Cf. In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (Bankr. 9th Cir.1983) (bad faith found where petitioner's motive was to cause hardship or to delay creditors by resorting to Chapter 11 merely to invoke automatic stay without ability to reorganize).

It is true that a number of the *Wentworth* factors are present in this case: I–

95's unsecured creditors and tax obligations represent only about 6% of the total scheduled debt; I-95 has no income at this point; no other creditors have "pressured" for payment; the real estate is the only significant asset of the Debtor; this is essentially a two-party dispute, and has been from the beginning; the petition was filed on the eve of foreclosure; and the Debtor's pre-petition performance has been less than exemplary. However, it is also true that several *Wentworth* factors are noticeably absent: there was no previous bankruptcy filing by the Debtor or any related entity; this is not a "new debtor syndrome" case; [6] and there is an ongoing business, to the extent that the Debtor continues to market the property, albeit in admittedly adverse economic conditions.

Accordingly, and based upon the totality of circumstances, we are unable to find bad faith based solely on the Debtor's pre-petition conduct, vis-a-vis BNE. However, unless there is a concomitant ability and bona fide effort to reorganize, the Chapter 11 petition must be dismissed for that reason. In *In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 765 (1st Cir.1983), the First Circuit established what is essentially an "objective futility" test to insure that there is "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *See also Carolin Corp.,* 886 F.2d at 701.

### ABILITY TO REORGANIZE

During the course of the trial we heard a great deal of testimony concerning the value of the Debtor's real estate. While the Debtor correctly points out that we are not here on a Motion for Relief From Stay, value is certainly relevant to a determination of whether the Debtor's efforts are futile, notwithstanding its best intentions to reorganize.

BNE's appraiser, Gerard McDonough, testified to a market value of $2,400,000 as of November 1, 1990, using a direct sales comparison and discounted cash flow analysis. This appraisal updated an earlier $4,050,000 appraisal he had done as of June 13, 1989. The Debtor's appraiser, Peter Scotti, valued the real estate within a range of $2,900,000 to $3,100,000, using both the direct sales analysis and a phased land development method.

We find it unnecessary in the context of this inquiry to analyze in depth the strengths and weaknesses of each appraisal, or to find a particular value. In general, however, we accept the reasoning of the Scotti appraisal that calls for a phased improvement scheme, which would have the salutary effect of reducing, over time, the overall debt service. At the same time, we are not rejecting out of hand McDonough's opinion of a sharp decline in value for this industrial property over the eighteen month period in question. In any event, both appraisals attribute significant value to the property (although we expressly make no finding as to Debtor's equity). Comparable industrial sites in the state have had, on average, at least some success, notwithstanding the economic slump occurring throughout the entire Northeast. In addition, the adjacent State industrial park and the subject parcel's proximity to a major interstate highway clearly add to the attractiveness of this site as a potentially successful industrial park. The negative testimony of BNE's real estate development expert, Donald Smyth, does not give adequate recognition to these factors.

Additionally, we heard testimony from Mr. Teverow regarding his past and ongoing efforts to assemble, engineer, plan, and obtain the numerous local and state regulatory approvals necessary for the development of the property. Indeed, more than half the unsecured debt is in connection with that process. We are satisfied that there have been extensive efforts, and significant achievements regarding approvals.

---

**6.** *See, e.g., In re Yukon Enter., Inc.,* 39 B.R. 919, 921 (Bankr.C.D.Cal.1984) ("once the creditor establishes that the transfer of the distressed property to the [newly-formed] debtor was in close proximity to the filing of the case, a prima facie showing of bad faith has been [made], thus creating a rebuttable presumption of bad faith"). *See also In re Assembled Interests Corp.,* 117 B.R. 31, 33 (Bankr.D.N.H.1990); *In re Eighty South Lake, Inc.,* 63 B.R. 501 (Bankr.C.D.Cal.1986), *aff'd,* 81 B.R. 580 (Bankr. 9th Cir. 1987).

Furthermore we find that, if permitted to, the Debtor intends to continue its development and marketing efforts.

We also heard from Nicholas Cambio (the operator of an adjacent gravel operation), who has been the subject of a much-discussed intended purchase of 21 acres from the Debtor. Clearly, and as subsequent events reveal,[7] Mr. Cambio was neither in a position, nor inclined to go forward with the sale. We also heard, over the Debtor's objection, from Charles Gricus, Director of Planning and Development for the Town of Coventry, who indicated that a gravel operation would not be a permitted use after I–95's abandonment of that use through the subdivision process. Notwithstanding that testimony, and in spite of the subsequent withdrawal of the intended Cambio sale, these facts do not preclude the prospect for the development of the industrial park. The Debtor's ability to reorganize does not and should not depend upon Mr. Cambio, and if that were the case, the future of this Chapter 11 case would indeed be in even deeper jeopardy than it is today.

Based upon the entire record, we find that, given a reasonable time, the Debtor's real estate is still capable of forming the basis of a successful plan, and Mr. Teverow's professed strong commitment to seeing this project through is a large part of this Court's reason for allowing the Debtor a reasonable opportunity to reorganize.

We hold, therefore, that while the prospect of a successful reorganization is certainly not assured, the Debtor's present intentions are not objectively futile, and are not otherwise in conflict with the aims of the Bankruptcy Code.

## CONCLUSION

Accordingly, we conclude that BNE has failed to establish that there is no reasonable possibility of rehabilitation, or that the Debtor filed the instant petition solely to

effect the automatic stay. BNE has concentrated heavily on the timing of the Debtor's filing of its petition, and on its unproductive pre-petition track record. Nonetheless, the facts do not support the requisite finding of either subjective or objective bad faith which, in the exercise of our sound discretion, would warrant dismissal of this case. The Bank of New England's Motion to Dismiss is, therefore, DENIED.

Enter Judgment consistent with this opinion.

---

7. While this matter was under advisement, a Notice of Intended Sale and Application to Compromise was filed by the Debtor, and was scheduled for hearing on February 14, 1991. Not surprisingly, the Notice of Intended Sale was withdrawn, when Nicholas Cambio elected not to exercise his purchase option. For the Debtor's future reference, the terms of the proposed sale most likely would not have met with this Court's approval.